UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| FRANK E STORK,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 3:20-CV-725 JD |

**OPINION AND ORDER**

**A.    Factual Background**

In October 2017, Mr. Stork applied for supplemental security income, claiming that, by August 2017, he had become unable to work due to his health conditions. (R. 194.) He primarily alleged that he was disabled due to back issues, leg weakness, and headaches. (R. 215.) Some of these health conditions allegedly stemmed from an auto accident, which also occurred in August 2017. (R. 40; R. 297.)

On June 17, 2019, after reviewing Mr. Stork's medical records and listening to his testimony, the ALJ found that he was not disabled. (R. 44.) The ALJ determined that Mr. Stork suffered from the following severe impairments: degenerative disc disease; lumbar spondylosis and radiculopathy; and degenerative arthritis. (R. 37.) However, the ALJ found that Mr. Stork's alleged hypertension, depression, and post-traumatic stress disorder were all non-severe. (R. 37–38.) The ALJ then found that none of these impairments or combination of impairments was equal in severity to the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 38.) After reviewing the record and listening to Mr. Stork at the hearing, the ALJ concluded that Mr.

Stork had the residual functional capacity for light work as defined in 20 C.F.R § 416.967(b), except for the following limitations: "the claimant is never able to climb ladders, ropes, or scaffolds, but is able to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs." (R. 39.) Determining that Mr. Stork could perform past relevant work as an assembly press operator, the ALJ found that Mr. Stork was not disabled. (R. 42–44.) Mr. Stork requested a review by the Appeals Council, which was denied on June 26, 2020 (R. 1), thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. § 405(g).

**B.   Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's

own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ also must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.     Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform past relevant work; and

5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.      Discussion**

Mr. Stork argues that the ALJ's decision should be remanded because the ALJ failed to provide a logical bridge for his conclusion that Mr. Stork did not meet or equal the criteria of Listing 1.04(A), (B), or (C) at Step 3. (DE 1 at 3–6.) Mr. Stork also argues that he, in fact, met each of those listing's criteria. (DE 1 at 7–18.) At step three of the disability analysis, an ALJ must determine whether the claimant's impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). If a claimant meets or equals a

4

listed impairment, he or she is presumptively disabled and does not need to make any further showing. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). Generally, when "considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Id.*

At Step 3, the ALJ concluded that the "claimant does not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 . . . ." (R. 38.) In coming to this conclusion, the ALJ's analysis was quite brief, writing that:

> A thorough review of the objective evidence, as well as the Listing of Impairments, leads the undersigned to conclude that the aforementioned "severe" impairments are not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P. In addition, no examining or non-examining physician has noted that the claimant's impairments equal any of the listed impairments.

(R. 39) Typically, an ALJ must discuss a listing by name at Step 3. *Barnett*, 381 F.3d at 668 ("In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name . . . ."); *see also* S.S.R. 17-2P (explaining that an ALJ "must provide a rationale for a finding of medical equivalence [to a listing]" and that this generally "will entail the adjudicator identifying the specific listing section involved . . ."). The Seventh Circuit has clarified that *Barnett* "[d]oes not require ALJs to name and discuss *every* Listing in their written decisions" and that "[s]uch a requirement would be particularly unreasonable where . . . the claimant does not identify a Listing at the hearing. . . ." *Wilder v. Kijakazi*, 22 F.4th 644, 652 (7th Cir. 2022) (emphasis added). However, unlike *Wilder*, Mr. Stork's prior counsel specifically referred to Listing 1.04 at the hearing, saying "we do believe that listing 1.04 should be considered" before proceeding to argue that specific portions of the record met each component of Listing 1.04(A). (R. 58.) At the hearing, Mr. Stork also asked the ALJ to consider Listing

1.04(C). (R. 91.) Furthermore, given that the ALJ found that Mr. Stork had three severe "spinal impairments" (degenerative disc disease, lumbar spondylosis with radiculopathy, and degenerative arthritis) (R. 40), Listing 1.04 was clearly the pertinent listing, since that is the Listing for "[d]isorders of the spine." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.04 (2019).

The Commissioner admits that the "ALJ did not specifically cite Listing 1.04" but argues that the ALJ's later analysis, concerning Mr. Stork's RFC, provided a sufficient explanation for why Mr. Stork's impairments were not disabling under Listing 1.04. (DE 24 at 8.) The Commissioner points to a recent Seventh Circuit case: *Zellweger v. Saul*, 984 F.3d 1251 (7th Cir. 2021). In *Zellweger*, the Seventh Circuit noted that "when an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing." *Id.* at 1255 (quoting *Jeske v. Saul*, 955 F.3d 583 (7th Cir. 2020)). Notably, the Seventh Circuit has found that subsequent analysis can provide a logical bridge for a conclusion at Step 3 even where the ALJ fails to specifically refer to the Listing. *See Adkins v. Astrue*, 226 F. App'x 600, 606 (7th Cir. 2007) (finding that the ALJ provided an adequate explanation at Step 3, where the ALJ considered the "issues relevant to [the Listing]" and provided more than a perfunctory analysis of those issues, even though the ALJ never referred to the pertinent listing).

Similar to those cases, the ALJ's later analysis when formulating the RFC provides a sufficient explanation for why the ALJ determined that Mr. Stork did not meet Listing 1.04. The Court wishes to emphasize at the outset that it would have been helpful for the ALJ to identify the listing by name and its criteria. *See Adkins*, 226 F. App'x at 605 (explaining that, where the ALJ failed to "refer to the Listing," the court was "somewhat at a loss to be able to ascertain how meaningfully he considered it . . ."). However, it is a failure to "mention [a] specific listing . . .

6

*combined with a perfunctory analysis*" that requires remand. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). As discussed more in depth below, ALJ analyzed the relevant issues to that listing in more than perfunctory detail.

   *(a) Listing 1.04(A)*

   At the time of the ALJ's decision, to meet Listing 1.04(A), the claimant had to show: a disorder of the spine "resulting in compromise of a nerve root (including the cauda equina) *or* the spinal cord," along with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, *motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss* and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019) (emphasis added).

   The ALJ's opinion sufficiently explains why Mr. Stork's impairments failed to meet or equal Listing 1.04(A). When formulating the RFC, the ALJ first considered the medical records immediately after Mr. Storks 2017 motor vehicle accident. The ALJ noted that these medical records failed "to indicate fracture or even minimal outward injury" and also failed to indicate "[t]he most minimal of focal or neurological deficits (such as loss of motor strength, sensory, ambulatory ability, or manipulative ability)." (R. 40.) Instead, the records showed that Mr. Stork had a "normal gait and motor strength (5/5), with no sign of trauma to the extremities and, despite complaints of headache, the claimant declined cranial imaging . . . ." (R. 40.) The ALJ also noted that in the years following Mr. Stork's motor vehicle accident, multiple examining physicians indicated that Mr. Stork did not show "any red flag symptoms," that he had a "very benign appearing [L/S [lumbo-sacral] spine."  (R. 40; R. 414; R. 703.)

Mr. Stork argues in his opening brief that "the ALJ apparently ignored Mr. Stork's May 1, 2018, MRI and his Electromyography (EMG) dated September 13, 2018 . . . showing mild to moderate mass effect on three nerve roots." (DE 1 at 7.) However, the ALJ explicitly considered both these tests, but found that diagnosis of lumbar radiculopathy and "mild" degenerative changes, "without more significant objective symptomology (such as focal or neurological deficit) fails to support greater limitations than assessed herein." (R. 41.) The ALJ also noted that Mr. Stork underwent an "objective functional capacity evaluation (FCE)," but that the record indicated he did "not give maximal effort on several [of the FCE] tests." (R. 41; R. 466.) The ALJ concluded that greater limitations than those assessed were not warranted because Mr. Stork's "self-perceived abilities [were] less than those [objectively] displayed" and that he "lack[ed] [a] focal or neurological deficit documented [with] objective findings." (R. 41.)

This "lack of focal or neurological deficit" also explains why Mr. Stork's impairment did not meet Listing 1.04(A). Under Listing 1.04(A), Mr. Stork had to show, among other things, that he had nerve root compression characterized by "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019). However, by finding that there was no objective evidence of a "focal or neurologic deficit," the ALJ was also finding that Mr. Stork failed to demonstrate the required motor and sensory loss. This is because a "focal neurologic deficit consists of a set of symptoms or signs in which causation can be localized to an anatomic site in the central nervous system." F.J. Wippold, *Focal Neurologic Deficit*, 29 American Journal of Neuroradiology 1998 (2008). Some of these symptoms can include "movement changes," such as "weakness" and "loss of muscle tone," and also "sensation changes," such as "decreases in sensation." U.S. National Library of Medicine, *Focal Neurologic Deficits*, MEDLINE PLUS, https://medlineplus.gov/ency/

article/003191.htm. As detailed above, the ALJ explained that there were no objective findings of focal neurologic deficits (such as loss of motor strength, sensory, ambulatory ability, or manipulative ability), referring to multiple reports indicating that that Mr. Stork had "full motor strength" and also reports that he did not give maximum effort on tests and was self-limiting. (R. 40–41; R. 435; R. 703.)

The ALJ also considered the opinion evidence of state medical consultants. At Step 3, in support of his finding that no listing was met, the ALJ wrote that no "examining or non-examining physician . . . noted that the claimant's impairments equal any of the listed impairments." (R. 39.) Both Dr. Ruiz and Dr. Eskonen examined whether Mr. Stork met Listing 1.04, but concluded that Mr. Stork was not disabled. (R. 100; R. 103; R. 111; R. 115.) Later, when formulating the RFC, the ALJ noted that Dr. Ruiz's and Dr. Eskonen's opinions were consistent with claimant's minimal report of injury after his accident, "his lack of greater abnormality upon diagnostic imaging, his lack of invasive surgical correction, and his *lack of objective focal or neurological deficit* . . . ." (R. 42 (emphasis added).) As detailed above, the lack of focal or neurological deficit explains why Listing 1.04(A) was not met. Therefore, the medical opinion evidence analyzed by the ALJ similarly supports his conclusion that the listing was not met.

Accordingly, the Court finds that the ALJ's analysis when formulating the RFC, in addition to the ALJ's reliance on the examining physician's opinions, provides a sufficient logical bridge to the conclusion that Mr. Stork's impairments did not meet or equal Listing 1.04(A).

    (b)  Listing 1.04(B)

9

Mr. Stork also argues that the ALJ failed to adequately explain why his impairments did not meet 1.04(B). First, the only listings which Mr. Stork and his Counsel identified at his hearing were Listing 1.04(A) and Listing 1.04(C). The Seventh Circuit has made clear that an ALJ does not need to "name and discuss *every* Listing in their written decisions" and that "[s]uch a requirement would be particularly unreasonable where . . . the claimant does not identify a Listing at the hearing." *Wilder*, 22 F.4th at 652 (emphasis added). Listing 1.04(B) was never identified at the hearing, and the ALJ was not under an obligation to "scour the Listings for a possible match, no matter how unlikely." *Id.* at 653.

Even if Listing 1.04(B) had been identified at the hearing, failure to consider it constituted harmless error. Harmless error occurs when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support . . . ." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). To meet Listing 1.04(B), Mr. Stork had to show a disorder of the spine "resulting in compromise of a nerve root (including the cauda equina) *or* the spinal cord," along with:

> Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019). Mr. Stork argues that his MRI on May 1, 2018 (R. 645) and his EMG from September 13, 2018 (R. 611), provided the required "medically acceptable imaging." (DE 1 at 9.) However, neither of these tests confirmed that Mr. Stork had spinal arachnoiditis. The MRI indicated that Mr. Stork had "mild multilevel degenerative changes" (R. 645), while the EMG indicated that he had "left L5 motor radiculopathy" (R. 611). Nowhere do these test results confirm spinal arachnoiditis, as required by Listing 1.04(B). *See*

*Padilla v. Colvin*, No. 2:12-CV-202-JEM, 2014 WL 899188, at *10 (N.D. Ind. Mar. 7, 2014) (finding that an MRI revealing clumping nerve roots which "may be secondary to arachnoiditis" was not sufficient to meet the listing, since it did not "confirm the diagnosis"); *see also Chopka v. Saul*, No. 5:18CV945, 2019 WL 4039124, at *5 (N.D. Ohio Aug. 27, 2019) (noting that Listing 1.04B requires a "diagnosis of spinal arachnoiditis, not simply evidence thereof").

Mr. Stork also states that "the medical records show that [he] did have painful dysesthesia," but fails to direct the Court to any portion of the record supporting that conclusory statement, and also fails to direct the Court to any records supporting that he needs to change his position or posture more than once every 2 hours. (DE 1 at 9.) There are some portions of Mr. Stork's testimony where he opined that he could only "sit [for] probably like 30 minutes" and could only stand for "10 minutes," which seem to support him needing to change his position or posture more than once every two hours. (R. 72.) However, the ALJ explained that documents, particularly those concerning his performance on his functional capacity evaluation, showed that Mr. Stork had a "perception of his abilities that is less than those he was actually able to conduct." (R. 41; R. 466) Because the record does not include evidence showing that Mr. Stork had spinal arachnoiditis manifested by severe burning dysesthesia, and because the record supports that Mr. Stork was capable of greater physical ability than alleged, the Court has great confidence that, on remand, the Commissioner would find that Listing 1.04(B) had not been met. Accordingly, even if the ALJ's explanation had been deficient, it would amount to harmless error and remand would not be warranted.

    *(c)*    *Listing 1.04(C)*

Lastly, Mr. Stork argues that the ALJ failed to adequately explain why his impairments did not meet Listing 1.04(C). To meet Listing 1.04(C), Mr. Stork had to show a disorder of the

11

spine "resulting in compromise of a nerve root (including the cauda equina) *or* the spinal cord," along with:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively, as defined in 1.00B2b*.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2019) (emphasis added). An "inability to ambulate effectively means an extreme limitation of the ability to walk." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00 B(2)(b) (2019). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.* The ALJ noted multiple times different tests which found that Mr. Stork had "full motor strength" (R. 297; R. 433; R. 703.) These tests also indicated that Mr. Stork was ambulating without any devices and had intact movements. (R. 433; R. 703.) The ALJ then described how one physician, Doctor Zaidi, documented that Mr. Stork was without "any red flag symptoms" and ultimately dismissed Mr. Stork from her care after she told him he was not disabled, he became upset, and then refused to comply with her recommendations. (R. 41; R. 414)  Again, the Court believes that this analysis, indicating that Mr. Stork could ambulate effectively, in addition to the ALJ's consideration at Step 3 of Dr. Ruiz's and Dr. Eskonen's opinions, sufficiently explains why Listing 1.04(C) was not met.

Even if the ALJ had failed to sufficiently explain why Listing 1.04(C) was not met, this would amount to harmless error. To meet Listing 1.04(C), an individual must show that they have "chronic nonradicular pain." Mr. Stork, in his opening brief, makes no attempt to argue that he had chronic nonradicular pain, but instead asserts that he has "chronic radicular pain."  (DE 1 at 13.) The regulations explain that nonradicular pain "is distinctly different from the radicular type of pain seen with a herniated intervertebral disc" and "is often of a dull, aching quality." 20

12

C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(K)(3). Mr. Stork does not point to any evidence in his brief supporting a finding of chronic nonradicular pain, nor does the Court see any in the record. Furthermore, physicians indicated he could ambulate effectively, as noted above, and Mr. Stork also showed up to his hearing with only one cane, which he had been using for only three weeks. Examples of ambulating ineffectively, under the regulations, include "inability to walk without the use of . . . *two* canes." *Id.* § 1.00 B(2)(b) (2019). Accordingly, the Court finds that, even had the ALJ failed to adequately explain his reasoning as to why Listing 1.04(C) had not been met, it would constitute harmless error.

**E.    Conclusion**

For those reasons, the Court AFFIRMS the Commissioner's decision. The Clerk is DIRECTED to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED:   April 5, 2022

                                                               /s/ JON E. DEGUILIO
                                                               Chief Judge
                                                                United States District Court